**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR M. FLYNN (SBN 253362)
*tflynn@fmfpc.com*
KADEN BYRON (SBN 333158)
*kbyron@fmfpc.com*
ALLISON FERRARO (SBN 351455)
*aferraro@fmfpc.com*
DANIEL SACHS (SBN 361027)
*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiffs***

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHERRIE OLIVER and MICHAEL TESTONE, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>THE PROCTER & GAMBLE CO.,<br><br>Defendant. | Case No.: '26CV3859 JO BJW<br><br>CLASS ACTION<br><br>**COMPLAINT FOR CONSUMER FRAUD AND BREACH OF WARRANTY**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs SHERRIE OLIVER and MICHAEL TESTONE, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby bring this action against Defendant THE PROCTER & GAMBLE CO. ("P&G"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1. P&G sells a variety of toothpastes under the Crest Pro-Health brand, which it markets as delivering improved gum health and treatment of gingivitis (the "Products"[1]).

2. These representations are misleading, however, because the Products contain sodium lauryl sulfate ("SLS"), a harsh detergent and known irritant that, at the levels present in the Products, can damage gum and mouth tissue, inhibit wound healing, trigger inflammation, cause allergic and contact-sensitivity reactions and epithelial sloughing, and disrupt the oral microbiome. These are the very conditions P&G claims the Products prevent or reduce.

3. Plaintiffs bring this action against P&G on behalf of themselves, similarly situated Class Members, and the general public to enjoin P&G from deceptively marketing the Products in this manner and to recover compensation for injured Class Members.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs and at least one member of the class of plaintiffs is a citizen of a state different from P&G. In addition, more than two-thirds of the Members of the Class reside in states other than the state in which P&G is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

---

[1] This includes at least the following varieties: Advanced Gum Protection, Advanced Gum Restore, Enamel Repair and Gum, Gum Detoxify Plus, Gum and Enamel Restore, Gum and Sensitive, Gum Recession, and Gum and Whitening.

5. The Court has personal jurisdiction over P&G as a result of its substantial, continuous and systematic contacts with the State, and because P&G has purposely availed itself of the benefits and privileges of conducting business activities within the State, including by marketing, distributing, and selling the Products in California.

6. Venue is proper in this Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because P&G resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

7. Plaintiff Sherrie Oliver is a citizen of California who resides in Riverside County, California.

8. Plaintiff Michael Testone is a citizen of California who resides in San Diego County, California.

9. Defendant The Proctor & Gamble Company is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

## FACTS

### I. P&G MARKETS THE PRODUCTS AS PROMOTING ORAL HEALTH

10. During the four years preceding the filing of this Complaint and continuing today, P&G has manufactured, distributed, and sold the Products throughout California.

11. The Products' labels make largely uniform representations concerning oral health. While the specific language and placement may vary slightly from product to product, the overall message is consistent: the Products promote improved gum health and treatment or reversal of gingivitis.

#### A. Advanced Gum Protection

12. As depicted below, the label of Crest Pro-Health Advanced Gum Protection Toothpaste contains oral health representations including "GUM PROTECTION," "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "Protects against & helps reverse gingivitis in 4 weeks," "Clinically proven on . . . gingivitis," and "✓GINGIVITIS."




### B. Advanced Gum Restore

13. As depicted below, the label of Crest Pro-Health Advanced Gum Restore Toothpaste contains oral health representations including "GUM RESTORE," "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "Promotes Gum Healing," "Clinically Proven Healthier Gums," and "Promotes healing and helps gums return to a healthier condition fast."



**C. Enamel Repair and Gum**

14. As depicted below, the label of Crest Pro-Health Enamel Repair and Gum Toothpaste contains oral health representations including "GUM," "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "Helps reverse early gum damage in 2 weeks," "Helps reverse gingivitis," "Clinically proven to fortify gums," and "PREVENTS HARMFUL OXIDANTS BY REVERSING GINGIVITIS."




**D. Gum Detoxify Plus**

15. As depicted below, the label of Crest Pro-Health Gum Detoxify Toothpaste contains oral health representations including "GUM DETOXIFY," "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "CLINICALLY PROVEN HEALTHIER GUMS IN 1 WEEK," "CLINICALLY PROVEN TO FORTIFY GUMS," and "PREVENTS HARMFUL OXIDANTS BY REVERSING GINGIVITIS."




## E. Sensitive and Gum

16. As depicted below, the label of Crest Pro-Health Sensitive and Gum Toothpaste contains oral health representations including "GUM," "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "strengthens gums," "CLINICALLY PROVEN TO FORTIFY GUMS," and "Dissolves & lifts away gum harming plaque."



## F. Gum Recession

17. As depicted below, the label of Crest Pro-Health Gum Recession Toothpaste contains oral health representations including "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "GUM RECESSION," "Reverses weak spots, even in areas of RECESSION," "reverse gingivitis even in areas of recission," "CLINICALLY PROVEN HEALTHIER GUMS IN 1 WEEK," "FORTIFIES GUMS," and "GUM RECESSION."




## G. Gum and Enamel Restore

18. As depicted below, the label of Crest Pro-Health Gum and Enamel Restore Toothpaste contains the oral health representations, "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "GUM . . . RESTORE," and "Heals gums."




### H. Gum and Whitening

19. As depicted below, the label of Crest Pro-Health Gum and Whitening Toothpaste contains the oral health representations, "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "GUM," and "Deeply cleans gums."



* * *

20. The Products' oral health representations convey a net impression or takeaway message that the Products benefit oral and gum health, and treat or reverse gingivitis.

## II. SODIUM LAURYL SULFATE IS AN IRRITANT THAT CAN HARM ORAL HEALTH

21. The mouth is comprised of, *inter alia*, the teeth and its supporting structures, and the inner lips or oral mucosa, which is comprised of specialized epithelial (skin) cells.

22. The specialized tissue surrounding and supporting the teeth is called periodontium. It is comprised of four main tissues: gingiva (gums), periodontal ligament (PDL), cementum, and alveolar bone.

23. The fibroblast is the most abundant cell type of the periodontium and has a central role in homeostasis, pathogenesis, and healing. Sixty-five percent of cells in gingival connective tissue are fibroblasts.[2]

24. The penetration of oral mucosa by environmental antigens or carcinogens—and subsequent host immune responses—are thought to play important roles in the etiology of several oral mucosal diseases. Accordingly, the oral epithelium is an important physiologic barrier of the human body.[3]

25. Oral mucosal wounds heal more rapidly and with less scar tissue formation compared to skin wounds, but there are substances that can prolong the healing process of oral wounds.[4]

---

[2] Chuang A.H., et al., "Effect of Sodium Lauryl Sulfate (SLS) on Primary Human Gingival Fibroblasts in an In Vitro Wound Healing Model," 184 Mil. Med. 97-101, at 97 (2019) ["Chuang (2019)"]

[3] *See* Paul, N. et al., "Foaming at the Bit: Sodium Lauryl Sulphate (SLS)-free toothpastes," 202 NZDA News, pp. 27-36 (March 2021).

[4] Sabri, H., et al., "The Yin and Yang of Sodium Lauryl Sulfate Use for Oral and Periodontal Health: A Literature Review," 24 J. Dent. (Shiraz), pp. 262-276 (2023), at 263 (citations omitted) ["Sabri (2023)"].

26. Toothpaste—often referred to in the academic literature as "dentifrice"—has become a complex healthcare product, often containing more than 20 ingredients, including formulation excipients and therapeutic or other substances, integrated with the aim of combatting various oral diseases and conditions while providing cosmetic benefits.[5]

27. One condition many toothpastes purport to address, including the Products at issue here, is gingivitis. Gingivitis is the inflammation or infection of the gums, usually caused by the buildup of plaque, an aggregation of oral bacterial species embedded in a poly-carbohydrate matrix, which is attached to the tooth's surface. Gingivitis can lead to periodontitis, an oral infection that can cause irreversible destruction of tooth-supporting structures.[6]

28. Sodium lauryl sulfate (SLS) is an anionic surfactant, used to decrease the surface tension of water, and often used in toothpaste for its cleansing and foaming effects. It has been a standard surfactant in toothpastes since the 1970s. Most commercially available toothpastes contain from 0.5 to 2.0% SLS.[7]

29. Nevertheless, SLS can irritate mucous membranes in the mouth, cause canker sores and allergic reactions, inhibit gingival healing, and upset the oral microbiome, even in low concentrations.[8]

---

[5] *See* Kasi S., et al., "Side Effects of Sodium Lauryl Sulfate Applied in Toothpastes: A Scoping Review," 35 Am. J. Dent. No. 2, pp. 84-88, at 84 (2022) ["Kasi (2022)"].

[6] Sabri (2023), *supra* n.4, at 269.

[7] Chuang (2019), *supra* n.2, at 97; *see also* Lippert, F., "An introduction to toothpaste – its purpose, history and ingredients," 23 Monographs in Oral Science, Toothpastes, pp. 1-14 (2013) (C. van Loveren ed.).

[8] *See* Kasi (2022), *supra* n.5. SLS is also responsible for the peculiar, so-called "orange juice" effect on taste reception, whereby orange juice drunk soon after toothbrushing is rendered unpleasant and astringent. This is due to both direct inhibition of SLS on taste receptors and indirectly through its dissolution of phospholipids that normally block bitter taste receptors. *See* Salazar, S., et al., "The effectiveness of dentifrices without and with sodium lauryl sulfate on plaque, gingivitis and gingival abrasion—a randomized clinical trial," 20 Clin. Oral Invest., pp. 443-450 (2016) ["Salazar (2016)"]; DeSimone, JA, et al., "Surface active

**A. Mucosal Desquamation (Inner Lip Sloughing) and Aphthous Ulcers (Canker Sores)**

30. Due to their ability to solubilize lipid membranes, surfactants can elicit irritant skin reactions by direct cytotoxicity to oral epithelial cells.[9]

31. One of the first reports of negative effects of SLS on oral health was a 1978 "case report [that] established a cause and effect relationship between SLS and desquamation in a patient taking drugs with anti-sialic activity."[10] In that patient, "[t]he amount of sloughing was found to be directly related to the use of the SLS-containing toothpaste," and "[w]hen the toothpaste was discontinued, the desquamation was reversed within 24 hours."[11]

32. A pilot study that followed in 1986 compared the effect of a toothpaste containing 2.4 grams of SLS to one containing "no detergents, preservatives, fluoride or other therapeutic agents."[12] Thirty-two healthy dental hygiene students were divided into two groups, one using the toothpaste containing SLS and the other using the control toothpaste. After a week, the epithelial cells in their saliva were counted to assess the degree of mucosal sloughing. "The results showed an increase in epithelial cell count following

---

taste modifiers: a comparison of the physical and psychophysical properties of gymnemic acid and sodium lauryl sulfate," 5 Chem. Senses, No. 4, pp. 317-330 (1980).

[9] Effendy, I., et al., "Surfactants and experimental irritant contact dermatitis," 33 Contact Dermatitis, No. 4, pp. 217-225 (1995).

[10] Chuang (2019), *supra* n.2, at 97 (citing Rubright WC, et al., "Oral slough caused by dentifrice detergents and aggravated by drugs with antisialic activity," 97 J. Am. Dent. Assoc., pp. 215-220 (1978)).

[11] *Id.*; *see also* Sabri (2023), *supra* n.4, at 263 (The "side effects of SLS in oral health" that Rubright *et al* reported "mostly consist of dose-dependent irritative dermal reactions in high-dose usage as well as oral mucosa desquamation and reduction in the function of the protective barrier of oral epithelium due to multi factors.").

[12] Chuang (2019), *supra* n.2, at 97 (citing Searls JC, et al., "The influence of dentifrice detergents on oral epithelial slough," 60 Dent. Hyg. (Chic) 20-3 (1986)).

expiration of saliva after brushing with an SLS-containing dentifrice for 1 week, compared with the control."[13]

33. A few years later, researchers "compared the topical effect of a test dentifrice with different concentrations of SLS to a placebo dentifrice on visible oral desquamation and epithelial flakes in saliva. Five dentifrices were used varying only in different concentration of SLS (0.0, 0.25, 0.5, 1.0, and 1.5%). They demonstrated a dose-response effect with increasing concentrations of SLS, to the increased incidence of mucosal desquamation."[14]

34. The same researchers "observed [that] the denaturing effect of SLS on the oral mucin layer, with exposure of underlying epithelium, induced incidence of recurrent aphthous ulcers (RAU),"[15] known colloquially as canker sores. These results were bolstered by "clinical double-blind crossover study of 30 patients with frequent occurrences of RAU," which "suggested that an SLS-free toothpaste may be recommended for patients with RAU."[16]

35. Another group of researchers found that SLS-free toothpastes "affected the ulcer-healing process and reduced pain in the daily lives of patients with RAU," and that the "duration of ulcers and mean pain score were significantly decreased during the period using SLS-free dentifrice compared to two SLS-containing dentifrices at 1.5%."[17] Similarly, a 2012 study divided 90 patients into 3 groups and analyzed clinical parameters after

---

[13] *Id.*

[14] *Id.* (citing Herlofson BB, et al., "Desquamative effect of sodium lauryl sulfate on oral mucosa," 51 Acta. Odontol. Scand., pp. 39-43 (1993)).

[15] *Id.* (citing Herlofson BB, et al., "Sodium lauryl sulfate and recurrent aphthous ulcers. A preliminary study," 52 Acta. Odontol. Scand. No. 5, pp. 257-919 (1994)).

[16] *Id.* (citing Herlofoson BB, et al., "The effect of two toothpaste detergents on the frequency of recurrent aphthous ulcers," 54 Acta. Odontol. Scand. No. 3, 150-3 (1996)).

[17] Chuang (2019), *supra* n.2, at 100 (citing Healy CM, et al., "Effect of sodium lauryl sulfate-free dentifrice on patients with recurrent ulceration," 5 Oral. Dis. No. 1, pp. 39-43 (1999)).

intervention, finding statistically significant differences in the healing duration of ulcers and pain score in the SLS-free group.[18]

36. In a 2013 Letter to the British Dental Journal, two practitioners described a patient's oral mucosal peeling, which they opined "may be caused by sodium lauryl sulphate (SLS) containing oral hygiene products[.]"[19]

Oral epitheliolysis (also known as shedding oral mucosa or oral mucosal peeling) is a rarely described and often unrecognised superficial desquamation of oral mucosa that may be caused by sodium lauryl sulphate (SLS) containing oral hygiene products, though some



**Fig. 1 Grey-white strips of oral epithelium sloughing from the buccal mucosae and dorsal tongue**

37. In addition, "[o]ne of the conditions that can cause erosive and ulcerative lesions in the oral cavity is hypersensitivity reaction to substances," and "SLS is known to be . . . involved in the destruction of the oral mucosal epithelium and has the ability to cause contact sensitivity-like reactions, as well as allergic contact reactions and irritating reactions

---

[18] Sabri (2023), *supra* n.4, at 267 (citing Shim, Y, et al., "Effect of sodium lauryl sulfate on recurrent apthous stomatitis: a randomized controlled clinical trial," 18 Oral Diseases, pp. 655-660 (2012) ["Shim (2012)"]).

[19] Hassona, Y. et al., "Oral Mucosal Peeling," 214 British Dental J., No. 8, p. 374 (Apr. 27, 2013).

on oral mucosa."[20] One researcher showed that "high doses of SLS (≥0.015%) lead to epithelial cell degradation."[21]

38. It has also "been shown that the use of toothpaste containing SLS causes more mouth ulcers in patients than the use of toothpastes without it."[22]

39. The mechanism of SLS's effect on oral mucosa has been studied. "In one study in animal models," researchers "reported that sensitivity to low concentrations of SLS is much higher for the oral mucosa than the skin," and "other reports showed that SLS usage dries up the oral mucosal protective layer and exposes the buccal mucosa and gingiva to irritants."[23] "However, SLS may also denature the proteins of mucosa considering its affinity to them."[24] SLS "is capable of making gingiva and mucosa vulnerable to exogenous antigens

---

[20] Sabri (2023), *supra* n.4, at 269 (citing Neppelberg E, et al., "Dual effects of sodium lauryl sulphate on human oral epithelial structure," 16 Exp. Dermatol., pp. 574-579 (2007) ["Neppelberg (2007)"]; Brown RS, et al., "Inflammatory reaction of the anterior dorsal tongue presumably to sodium lauryl sulfate within toothpastes: a triple case report," 125 Oral Surg Oral Med Oral Patho Oral Radio. pp. e17-e21 (2018) ["Brown (2018)"]; Ersoy M., et al., "The allergy of toothpaste: a case report," 36 Allergol. Immunopathol. (Madr.), pp. 368-370 (2008) ["Ersoy (2008)"]; Rantanen I., et al., "The effects of two sodium lauryl sulphate-containing toothpastes with and without betaine on human oral mucosa in vivo," Swedish Dent. J. p. 31 (2003) ["Rantanen (2003)"]).

[21] *Id.* (citing Neppelberg (2007), *supra* n.20).

[22] *Id.* (citing Dewi TS, "Lesi Erosif Mukosa Oral Sebagai Akibat Penggunaan Pasta Gigi Mengandung Sodium Lauryl Sulfate," 2 J. Material Kedokteran Gigi., pp. 75-82 (2013)).

[23] *Id.* at 263 (citing Ahlfors EE, et al., "Contact sensitivity reactions in the oral mucosa," 59 Acta. Odontol. Scand., pp. 248-254 (2002); Rantanen I, et al., "Effects of a betaine-containing toothpaste on subjective symptoms of dry mouth: a randomized clinical trial," 4 J. Contemp. Dent. Pract., pp. 11-23 (2003) ["Ahlfors (2002)"]; Macdonald JB, "Oral leukoedema with mucosal desquamation caused by toothpaste containing sodium lauryl sulfate," 97 Cutis pp. E4-E5 (2016); Jensena JL, "Clinical implications of the dry mouth: oral mucosal diseases," 842 Ann. N. Y. Acad. Sci., pp. 156-162 (1998) ["Macdonald (1998)"]).

[24] *Id.* (citing Shim (2012)).

by denaturing proteins of mucin" (microproteins that occur in secretions of mucous membranes).[25]

40. As a result, "[m]ucosal and skin permeability are increased by SLS . . . ."[26] "[S]tudies have shown that this substance interrupts the integrity of the cell membrane."[27] Moreover, "[i]t is suggested that SLS affects the membrane due to its amorphous solid dispersion property and therefore . . . is a danger to the safety of toothpastes."[28]

**B. Gingival Wound Healing and Periodontitis**

41. The "consumption of SLS can increase the duration of [the] wound healing process."[29]

42. Several *in vitro* studies have demonstrated SLS's interference with gingival tissue healing.

43. One *in vitro* study showed that applying SLS to cementum, a component of the periodontium, can lead to its physical change, with five-minute exposure resulting in exposing collagen and dentinal tubules.[30]

---

[25] *Id.* at 269 (citing Siegel IA, et al., "Surfactant-induced alterations of permeability of rabbit oral mucosa in vitro," 44 Exp. Mol. Pathol., pp. 132-137 (1986)).

[26] *Id.* (citing Ahlfors (2002), *supra* n.23).

[27] *Id.* at 271 (citing Ghosh, S, et al., "A mulittechnique approach in protein/surfactant interaction study: physiochemical aspects of sodium dodecyl sulfate in the presence of trypsin in aqueous medium," 3 Biomacromolcules, pp. 9-16 (2002)).

[28] *Id.* (citing Chen, Y et al., "Sodium Lauryl Sulfate Competitively Interacts with HPMC-AS and Consequently Reduces Oral Bioavailability of Posaconazole/HPMC-AS Amorphous Solid Dispersion," 13 Mol. Pharm., pp. 2787-2795 (2016); Cvikl, B, et al., "The in vitro impact of toothpaste extracts on cell viability," 123 Eur. J. Oral. Sci., No. 3, pp. 179-185 (June 2015) ["Cvikl (2015)"]).

[29] *Id.* (citing Chen, L, et al., "Positional differences in the wound transcriptome of skin and oral mucosa," 11 BMC Genomics., p. 471 (2010); Politis C, et al., "Wound healing problems in the mount," 7 Front. Physiol., p. 507 (2016); Chuang (2019), *supra* n.2).

[30] *Id.* (citing Okte E, et al., "Topography of periodontally involved human root surfaces after different chemical treatment modalities: an in vitro scanning electron microscopic study," 42 J. Oral Sci. pp. 139-146 (2000)).

44. In another study, human gingival fibroblasts (HGFs) were grown in culture plates. A 3 mm wound was created on confluent HGFs, and the cells were challenged with 0 (control), 0.01, 0.02, 0.03, 0.03, or 0.05% SLS-containing media once daily for 2 minutes. The cells were stained every other day and the percent of wound fill area measured. The results were as follows.

***Wound Healing %***

| | Day 2 | Day 4 | Day 6 | Day 8 |
|---|---|---|---|---|
| 0% SLS | 15% | 35% | 67% | 98% |
| 0.01% SLS | 10% | 20% | 65% | 84% |
| 0.02% SLS | 7% | 10% | 15% | 25% |
| 0.03% SLS | 5% | 8% | | |
| 0.04% SLS | | | | |
| 0.05% SLS | | | | |




Thus, the results showed a dose- and time-dependent inhibition on wound fill by SLS. Moreover, significant inhibitions of wound fills were observed at concentrations of 0.025 and higher, from Day 4. At 0.05% SLS, little wound fill was evident at Day 2, and by Day 4, a large percent of confluent HGF cells had detached.[31]




[31] Chuang (2019), *supra* n.2.

45. Another study on *in vitro* exposure of fibroblast cells to various toothpaste detergents found that SLS's "half-lethal" concentration was 1%, compared to half-lethal concentrations of 10% and 70% for alternative detergents, Steareth-20 and cocamidopropyl betaine, respectively.[32] Thus, "SLS . . . has been shown to have a significant toxic results *in vitro*," with "the toothpaste containing SLS" having "completely compromised cell viability."[33]

46. In another study, "SLS showed to be the highest toxic ingredient among the other toothpaste ingredients" tested, "and it presented more than 90% toxicity at whole concentrations on human gingival fibroblasts."[34]

**C. Allergic and Contact-Sensitivity Reactions**

47. "SLS is known to be an anionic surfactant involved in the destruction of the oral mucosal epithelium and has the ability to cause contact sensitivity-like reactions, as well as allergic contact reactions and irritating reactions on oral mucosa."[35] Some examples are "erythematous irritating reactions, mouth ulcers, oral inflammation, and leukoedema following consumption of SLS-containing toothpastes and products."[36] "Allergies to toothpastes containing SLS have also been shown to cause oral lesions."[37]

48. There are reports of allergic reactions to SLS in the dental-related academic literature. For example, some researchers "reported a 19-year-old female case" with

---

[32] Cvikl (2015), *supra* n.28.

[33] Sabri (2013), *supra* n.4, at 270 (citing Cvikl (2015), *supra* n.28).

[34] *Id.* (citing Tabatabaei M et al., "Cytotoxicity of the Ingredients of Commonly Used Toothpastes and Mouthwashes on Human Gingival Fibroblasts," 16 Frontiers Dent., pp. 450-457 (2019).

[35] *Id.* at 269 (citing Macdonald (1998), *supra* n.23; Brown (2018), *supra* n.20; Ersoy (2008), *supra* n.20; Rantanen (2003), *supra* n.20); *see also id.* at 271-72 (SLS "can also affect the oral epithelium negatively, resulting in allergic and hypersensitivity reactions in some patients." (citing Ahlfors (2002), *supra* n.23; Kowitz G et al., "Effects of dentifrices on soft tissues of the oral cavity," 28 J. Oral Med., pp. 105-109 (1973)).

[36] *Id.* at 272.

[37] *Id.* at 269 (citing Brown (2018), *supra* n.20).

exfoliative cheilitis (EC), a "disease that affects the vermilion of one or both lips by continuous production and therefore, desquamation of thick keratin scales."[38] "A test patch revealed the patient was allergic to SLS. Slow healing occurred after cessation of SLS-containing toothpaste and applying glycerin borax and hydrogen peroxide (1%) mouthwash."[39]

**D. Disruption of the Oral Microbiome**

49. The human mouth has the second-most diverse bacterial community in the body, comprised of biofilms formed in different oral cavity niches and including approximately 1,000 species.[40] These "oral microorganisms protect the human body from invasion by undesirable internal and external perturbations," but "a disruption of the delicate equilibrium within the microbial ecosystem contributes to various oral and systemic diseases," such as "gingivitis and periodontitis," which "affect up to 90% of the world population."[41]

50. In 2024, researchers presented the results of a study of the effect of SLS on the oral microecology. They systematically investigated the impact of SLS across three systems: biofilms, animal models, and clinical populations. "SLS was found to kill bacteria in both preformed biofilms (mature biofilms) and developing biofilms (immature biofilms), and disturbed the microbial community structure by increasing the number of pathogenic bacteria. SLS also destroyed periodontal tissue, promoted alveolar bone resorption, and enhanced the extent of inflammatory response level."[42]

---

[38] *Id.* (citing Daley TD, et al., "Exfoliative cheilitis," 24 J. Oral Pathol. Med. pp. 177-179 (1995))

[39] *Id.*

[40] Shi Q., et al., "Effects of sodium lauryl sulfate and postbiotic toothpaste on oral microecology," 16 J. Oral Microb., pp. 1-15 (2024) (citations omitted).

[41] *Id.*, at 1 (citations omitted).

[42] *Id.*

## III. P&G'S ORAL HEALTH MESSAGING FOR THE PRODUCTS IS MISLEADING

51. Gum-health toothpaste occupies a unique place in the marketplace because consumers purchase it specifically to improve diseased or vulnerable gum tissue. Consumers therefore reasonably expect those products not to contain ingredients that the scientific literature has repeatedly associated with irritation, epithelial injury, impaired wound healing, oral barrier disruption, or recurrent aphthous ulcers.

52. Each of the Products contains SLS as an ingredient, likely in a concentration range of about 1%-1.5% based on literature regarding commercially available toothpastes. P&G nevertheless conveys a takeaway message that the Products promote, rather than harm, oral and gum health. Because SLS has known adverse effects on the mouth and gums as described above, these claims are highly misleading.

53. Consumers seeking out gum-health toothpaste are entitled to know the Products contain an ingredient widely recognized in the scientific literature as an oral irritant associated with inflammation, epithelial sloughing, impaired wound healing, recurrent aphthous ulcers, and disruption of the oral mucosal barrier.

54. For this reason, some toothpastes marketed to promote gum health specifically call out their lack of SLS, such as the Colgate Total Active Prevention Gum Protect Toothpaste depicted below.







55. Other examples of brands that market SLS-free toothpastes include Biotène, Burt's Bees, Hello, and Squigle. These companies spend money advertising their products as SLS-free because consumers value that information. Moreover, the existence of a market for SLS-free toothpaste, and manufacturers' decisions to advertise that feature, demonstrates that consumers consider the presence or absence of SLS to be material.

56. Despite marketing the Products with oral and gum health claims, P&G does not disclose on its product labeling or website any information about the potential harmful effects of SLS on oral and gum health.

57. P&G is under a duty to disclose this information to consumers because (a) P&G is revealing *some* information about its products—enough to suggest they promote oral and gum health—without revealing additional material information, (b) P&G's deceptive omissions concern human health, and specifically the detrimental health consequences of regularly using the Products, (c) P&G was in a superior position to know of the dangers presented by the SLS in its Products, and (d) P&G actively concealed material facts not known to Plaintiffs and other Class Members.

58. Average consumers are not familiar with SLS nor aware it is sometimes used in toothpaste. Moreover, although listed in the Products' (extremely) small-print ingredient list, "less than half of consumers read the entire package labeling before taking [over the counter] medicine."[43] One study found "only 42% of subjects said they read everything on the label when taking an [over the counter] medication for the first time and only 26% reported reading the active ingredients at first use."[44] It is likely an even smaller proportion of consumers read the inactive ingredients list on a toothpaste's often exceedingly small drug facts label, where SLS is listed on the Products.

59. P&G had other viable alternatives, as alternative surfactants with lower irritating properties have been investigated and found as alternatives to SLS in toothpaste. This includes, for example, cocamidopropyl betaine (CAPB), sodium methyl cocoyl taurate (SMCT), Poloxamer 407 (also known as Pluronic F127), and Steareth-30, a non-ionic

[43] Catlin JR et al., "The Effectiveness of Nonprescription Drug Labels in the United States: Insights from Recent Research and Opportunities for the Future," 6 Pharmacy 119 (2018).

[44] *Id.*

polyethylene glycol ether of stearic acid, which has been demonstrated to produce significantly fewer soft tissue lesions compared to SLS-containing toothpaste.[45]

## IV. PLAINTIFFS' PURCHASE, RELIANCE, AND INJURY

### A. Sherrie Oliver

60. Plaintiff Sherrie Oliver regularly purchased Crest Pro-Health Gum Detoxify Plus starting in approximately 2023, with her last purchase in November or December 2025. Ms. Oliver often made her purchases from stores such as Walmart in Moreno Valley and Riverside, California.

61. When purchasing Crest Pro-Health Gum Detoxify Plus, Ms. Oliver was looking for a toothpaste that, *inter alia*, would promote a healthy mouth and gums. In deciding to purchase the product, Ms. Oliver read and relied on labeling claims suggesting the product promoted oral and gum health, including "GUM DETOXIFY," "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "CLINICALLY PROVEN HEALTHIER GUMS IN 1 WEEK," "CLINICALLY PROVEN TO FORTIFY GUMS," and "PREVENTS HARMFUL OXIDANTS BY REVERSING GINGIVITIS."

62. These claims, and the overall oral and gum health message conveyed by the product's labeling, however, were and are deceptive because Crest Pro-Health Gum Detoxify Plus contains SLS, a documented oral irritant.

63. Ms. Oliver observed that she experienced pain, discomfort, and sensitivity in her teeth and gums after using the Crest Pro-Health Gum Detoxify Plus toothpaste for an extended period of time.

64. Ms. Oliver would have avoided purchasing Crest Pro-Health Gum Detoxify Plus if she knew it contained an irritant that can harm oral health, including harming the gums and causing inflammation. At the time Ms. Oliver purchased Crest Pro-Health Gum Detoxify Plus, she was not familiar with SLS as an ingredient, nor knowledgeable about its

[45] Salazar (2016), *supra* n.8; Green A, et al., "A randomised clinical study comparing the effect of Steareth 30 and SLS containing toothpastes on oral epithelial integrity (desquamation)," 80 J. Dent., pp. 533-539 (2019).

detrimental oral health effects, and did not notice SLS as an inactive ingredient in the Product.

**B. Michael Testone**

65. Plaintiff Michael Testone regularly purchased Crest Pro-Health Gum Detoxify Plus starting in approximately 2018, with his last purchase in February 2026. Mr. Testone often made his purchases from stores such as Target in San Diego, California, and from online retailers such as Amazon.

66. When purchasing Crest Pro-Health Gum Detoxify Plus toothpaste, Mr. Testone was looking for a toothpaste that, *inter alia*, would promote a healthy mouth and gums. In deciding to purchase the product, Mr. Testone read and relied on labeling claims suggesting the product promotes oral and gum health, including "GUM DETOXIFY," "TOOTHPASTE FOR . . . ANTIGINGIVITIS," "CLINICALLY PROVEN HEALTHIER GUMS IN 1 WEEK," "CLINICALLY PROVEN TO FORTIFY GUMS," and "PREVENTS HARMFUL OXIDANTS BY REVERSING GINGIVITIS."

67. These claims, and the overall oral and gum health message conveyed by the product's labeling, however, were and are deceptive because Crest Pro-Health Gum Detoxify Plus toothpaste contains SLS, a documented oral irritant.

68. Mr. Testone would have avoided any Crest Pro-Health toothpaste if he knew it contained an irritant that can harm oral health, including harming the gums and causing inflammation. At the time Mr. Testone purchased Crest Pro-Health Gum Detoxify Plus, he was not familiar with SLS as an ingredient, nor knowledgeable about its detrimental oral health effects, and did not notice SLS as an inactive ingredient in the Product.

* * *

69. Plaintiffs acted reasonably in relying on the challenged labeling claims, which P&G placed on the Products' labeling with the intent of inducing average consumers into purchasing the Products.

70. Plaintiffs acted reasonably in purchasing the Products, whose labels did not disclose the negative oral health effects of SLS, and in fact conveyed to reasonable consumers that the products promote a healthy mouth and gums.

71. The Products cost more than similar products without misleading labeling and would have cost less absent P&G's affirmative oral health statements and deceptive omissions regarding the Products' SLS content.

72. Through its misleading labeling and omissions concerning the Products, P&G was able to gain a greater share of the toothpaste market than it otherwise would have, and was able to increase the size of the market.

73. Plaintiffs paid more, and would only have been willing to pay less, or would be unwilling to purchase the Products at all, absent the misleading labeling complained of herein.

74. I Instead of receiving products that worked as advertised, the Products Plaintiffs and other Class Members received expose consumers to adverse oral health effects inconsistent with their represented benefits. For these reasons, the Products had less value than what Plaintiffs and other Class Members paid for them.

75. Plaintiffs and other Class Members lost money as a result of P&G's deceptive claims, omissions, and practices in that they did not receive what they paid for when purchasing the Products.

76. Plaintiffs still wish to purchase toothpaste products that promote oral and gum health, and continue to see the Products at the stores in which they regularly shop. Plaintiffs would purchase the Products in the future if they could be assured they do not contain any ingredients that undermine the products' represented efficacy. But unless P&G is enjoined in the manner Plaintiffs request, they will not be able to reasonably determine in the future whether the Products actually promote healthy gums.

77. Plaintiffs' substantive right to a marketplace free of fraud, where they are entitled to rely on representations such as those made by P&G with confidence, continues to be violated every time Plaintiffs are exposed to the Products' labels.

78. Plaintiffs' legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

79. While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a class of all persons in California who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Products (the "Class").

80. The Members in the proposed Class are so numerous that individual joinder of all Members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

81. Questions of law and fact common to Plaintiffs and the Class include:

a. Whether, through labeling and advertising the Products, P&G communicated a takeaway message that the Products promote oral and gum health;

b. Whether that message was material, or likely to be material, to a reasonable consumer, or whether P&G had reason to believe it was;

c. Whether, due to the Products' SLS content, the challenged labeling is false, misleading, or reasonably likely to deceive a reasonable consumer;

d. Whether P&G was under a duty to disclose information about the Products' SLS content;

e. Whether P&G omitted information about the Products' SLS content;

f. Whether P&G's omission was material, or likely to be material to a reasonable consumer;

g. Whether P&G's omission was likely to deceive a reasonable consumer;

h. Whether P&G was unjustly enriched;

i. Whether Plaintiffs and other Class Members are entitled to monetary damages and the measure of those damages; and

j. Whether Plaintiffs and other Class Members are entitled to restitution, disgorgement and/or other equitable and injunctive relief, and its proper scope.

82. These common questions of law and fact predominate over questions that affect only individual Class Members.

83. Plaintiffs' claims are typical of other Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to P&G's conduct. Specifically, all Class Members, including Plaintiffs, were subjected to the same misleading and deceptive conduct when they purchased the Products and suffered economic injury because the Products are misrepresented.

84. Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of consumer goods.

85. Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

86. P&G has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

87. As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 172000, *et seq.***

88. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

89. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

90. The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

**Fraudulent**

91. A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

92. As set forth herein, P&G's health and safety representations relating to the Products are likely to deceive reasonable consumers and the public.

**Unlawful**

As set forth herein, P&G's oral and gum health representations relating to the Products are "unlawful" under the UCL in that they violate at least the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.* ("FAL"), Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*. ("CLRA"), and 21 U.S.C. § 352 (deeming an over-the-counter drug misbranded if its label is false or misleading).

**Unfair**

93. P&G's conduct with respect to the labeling, advertising, and sale of the Products with oral and gum health representations was unfair because P&G's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, did not outweigh the gravity of the harm to its victims.

94. P&G's conduct with respect to the labeling, advertising, and sale of the Products with oral and gum health representations was also unfair because it violated public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the FAL, CLRA, and Federal Food, Drug, and Cosmetic Act.

95. P&G's conduct with respect to the labeling, advertising, and sale of the Products with oral and gum health representations was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided. Specifically, the increase in profits P&G obtained through the misleading labeling does not outweigh the harm to Class Members deceived into purchasing the Products believing they were healthy and

safe for regular use when in fact they contain SLS, which is potentially injurious to oral and gum health. Consumers could not have reasonably avoided this harm because SLS and its detrimental effects on oral and gum health is not widely known by average consumers. Further, the harm could have easily been avoided by P&G as it would have cost P&G nothing to refrain from using SLS, the challenged labeling, or the challenged omissions.

* * *

96. P&G profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

97. P&G's conduct caused and continues to cause substantial injury to Plaintiffs and other Class Members. Plaintiffs have suffered injury in fact as a result of P&G's unlawful conduct.

98. Plaintiffs and other Class Members are likely to continue to be damaged by P&G's deceptive trade practices because P&G continues to disseminate misleading information. Thus, injunctive relief enjoining P&G's deceptive practices is proper.

99. In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining P&G from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

100. Plaintiffs, on behalf of themselves and the Class, also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

101. Because Plaintiffs' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiffs' legal remedies are inadequate to fully compensate them for all of P&G's challenged behavior.

102. Moreover, because the Court has broad discretion to award restitution under the UCL and could, when assessing restitution under the UCL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiffs' breach of warranty claims)—and because restitution is not limited to returning to Class Members

monies in which they have an interest, but more broadly serves to deter the offender and others from future violations—the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the UCL, and are therefore inadequate.

**SECOND CAUSE OF ACTION**

**Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.***

103. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

104. The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

105. P&G's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because P&G has advertised the Products in a manner that is untrue and misleading, which P&G knew or reasonably should have known, and further omitted material information from the Products' labeling. As alleged herein, the advertisements, labeling, policies, acts, and practices of P&G relating to the Products were likely to mislead consumers acting reasonably.

106. Plaintiffs suffered injury in fact as a result of P&G's actions as set forth herein because they purchased the Products in reliance on P&G's false and misleading marketing claims stating or suggesting they promote oral and gum health, and in further reliance on P&G's deceptive omission of material information concerning the detrimental effects of the Products' SLS content.

107. P&G profited from the sale of the falsely and deceptively advertised Products to unwary consumers.

108. Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs seek, on behalf of themselves and other Class Members, the restitution of all monies from the sale of the

Products, which were unjustly acquired through acts of false advertising, and an Order enjoining P&G from continuing to engage in such acts.

109. Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiffs' breach of warranty claims)—and because restitution is not limited to returning to Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations—the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

**THIRD CAUSE OF ACTION**

**Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.***

110. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

111. The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

112. Plaintiffs and other Class Members are "consumers" under Cal. Civ. Code section 1761(d).

113. P&G is a "person" under Cal. Civ. Code section 1761(c).

114. The Products are "goods" under Cal. Civ. Code section 1761(a).

115. Plaintiffs and other Class Members' purchases of the Products are "transactions" under Cal. Civ. Code section 1761(e).

116. P&G's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by Plaintiffs and other Class Members, and violated and continue to violate the following sections of the CLRA:

a. Section 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b. Section 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c. Section 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d. Section 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

117. P&G profited from the sale of the deceptively advertised Products to unwary consumers.

118. P&G's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

119. As a result of P&G's wrongful behavior, Plaintiffs and the Class have suffered harm.

120. More than 30 days before filing this action, Plaintiffs sent P&G notice of its violations of the CLRA but P&G did not rectify its wrongful practices. Plaintiffs therefore seek restitution, actual damages, punitive damages, attorneys' fees, and prospective injunctive relief.

121. In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

**FOURTH CAUSE OF ACTION**

**Breach of Express Warranties, Cal. Com. Code § 2313**

122. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

123. Through the Products' labeling, P&G made affirmations of fact or promises, or descriptions of goods that, *inter alia*, the Products promote oral health, improve gum health and reverse gingivitis. These affirmations and descriptions include:

- "GUM PROTECTION";

- "Protects against & helps reverse gingivitis in 4 weeks";
- "Clinically proven on . . . gingivitis";
- "TOOTHPASTE FOR . . . ANTIGINGIVITIS";
- "Promotes Gum Healing";
- "Clinically Proven Healthier Gums";
- "Promotes healing and helps gums return to a healthier condition fast";
- "Helps reverse early gum damage in 2 weeks";
- "Helps reverse gingivitis";
- "PREVENTS HARMFUL OXIDANTS BY REVERSING GINGIVITIS";
- "CLINICALLY PROVEN HEALTHIER GUMS IN 1 WEEK";
- "CLINICALLY PROVEN TO FORTIFY GUMS";
- "strengthens gums";
- "reverse gingivitis even in areas of recission";
- "FORTIFIES GUMS"; and
- "Heals gums."

124. These representations were part of the basis of the bargain in that Plaintiffs and the Class purchased the Products in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

125. P&G breached its express warranties by selling products that, for the reasons described herein, do not meet the above affirmations, promises, and product descriptions.

126. That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiffs and Class Members paid for the Products.

127. As a result, Plaintiffs seek on behalf of themselves and other Class Members, actual damages arising as a result of P&G's breach of express warranties, including, without limitation, expectation damages, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314

128. Plaintiffs reallege and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

129. P&G is a merchant with respect to the goods of the kind that were sold to Plaintiffs and other Class Members, and there were, in the sale to Plaintiffs and other Class Members, implied warranties that those goods were merchantable.

130. Specifically, P&G impliedly warranted that the Products were merchantable in that they conform to the promises or affirmations of fact made on the container or label.

131. P&G breached this implied warranty because the Products were falsely advertised in the manner alleged herein, and thus did not conform to the promises or affirmations of fact made on the products' labels.

132. As an actual and proximate result of P&G's conduct, Plaintiffs and other Class Members did not receive goods as impliedly warranted by P&G. As a result, Plaintiffs seek, on behalf of themselves and other Class Members, actual damages, including, without limitation, expectation damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

133. Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against P&G as to each and every cause of action, and the following remedies:

a. An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

b. An Order requiring P&G to bear the cost of Class notice;

c. An Order compelling P&G to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending products;

d. An Order requiring P&G to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

e. An Order requiring P&G to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

f. An Order requiring P&G to pay compensatory, statutory, and punitive damages as permitted by law;

g. An award of attorneys' fees and costs; and

h. Any other and further relief that Court deems necessary, just, or proper.

**JURY DEMAND**

134. Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 2, 2026

/s/ Jack Fitzgerald

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmfpc.com*
TREVOR FLYNN
*tflynn@fmfpc.com*
KADEN BYRON
*kbyron@fmfpc.com*
ALLISON FERRARO
*aferraro@fmfpc.com*
DANIEL E. SACHS
*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiffs***